JOHN JOHNSON, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE CLASS OF THOSE SIMILARLY SITUATED

VERSUS

ORLEANS PARISH SCHOOL BOARD, XYZ INSURANCE COMPANY, CITY OF NEW ORLEANS, AND ABC INSURANCE COMPANY

* NO. 2022-CA-0731

*

* COURT OF APPEAL

*

FOURTH CIRCUIT

* STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 1993-14333, DIVISION "J"
Honorable D. Nicole Sheppard,
* * * * * *
**Judge Nakisha Ervin-Knott**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Karen K. Herman, Judge Nakisha Ervin-Knott)

Linda Suzanna Harang
LAW OFFICES OF WARREN A. FORSTALL, JR., PLC
320 N. Carrolton Ave, Suite 200
New Orleans, LA 70119-5111

Joseph M. Bruno
BRUNO & BRUNO LLP
855 Baronne Street
New Orleans, LA 70113

George J. G. Roux
ATTORNEY AT LAW
823 Saint Louis Street
New Orleans, LA 70112

Suzette P. Bagneris
THE BAGNERIS FIRM, LLC
1929 Jackson Avenue
New Orleans, LA 70113

4898317

Robin M. Primeau
MURRAY LAW FIRM
701 Poydras Street, Suite 4250
New Orleans, LA 70139

    COUNSEL FOR PLAINTIFFS/APPELLEES

Lisa W. Jordan
Lauren E. Godshall
TULANE UNIVERSITY LAW SCHOOL
6329 Freret Street
New Orleans, LA 70118

    COUNSEL FOR INTERVENORS/APPELLANTS


**AFFIRMED**
**March 15, 2023**

4898317

NEK
TFL
KKH

Appellants, Residents of Gordon Plaza, Inc. (hereafter "Corporation"), Shannon Rainey, Marilyn Amar, Lydwina Hurst, Jesse Perkins, and Samuel Egana (hereafter "Individuals") (hereafter collectively "Residents"), appeal the trial court's June 22, 2022 judgment, which granted the exceptions of no right of action, no cause of action, and res judicata filed by Appellees, John Johnson, Individually and as a Representative of the Class of Those Similarly Situated (hereafter "the John Johnson Class"). The John Johnson Class has filed an exception of prescription with this Court. For the following reasons, we deny the John Johnson Class' exception of prescription and affirm the trial court's judgment granting of the John Johnson Class' exception of no right of action.

## Factual Background and Procedural History

This case has been before this Court previously. The underlying facts were previously articulated by this Court:

> From the early 1900's until approximately 1958, the City of New Orleans (City) leased more than one hundred acres of land in the City's ninth ward for the operation of a municipal landfill and garbage dump. The site, known as the Agriculture Street Landfill (ASL), was bordered by Almonaster Boulevard on the west, Higgins Boulevard on the north, Louisa Street on the east, and the Peoples Avenue Canal and railroad tracks on the south. In 1965, the City reopened the ASL

4898317                                          1

site for the disposal of massive quantities of debris created by Hurricane Betsy.

In 1967, the City and the Housing Authority of New Orleans (HANO) entered into a cooperative agreement for the development of residential properties in the Desire area of the City. Between 1969 and 1971, Drexel Development Corporation constructed the Press Park town homes and apartments for HANO. No remediation or special site preparation was done before Press Park was constructed. In 1971, HANO purchased the completed Press Park project from Drexel and has owned and operated the site since that time. Some Press Park tenants participated in a "turn key" program, whereby a portion of their monthly rent was placed in an escrow account and applied toward the purchase of their town home unit. When their escrow account reached the amount needed for purchase of the unit, HANO transferred title of the unit to the tenant. HANO never advised any of the prospective Press Park tenants or home buyers that the site had once been a part of the City's landfill.

In the late 1970s, the City performed soil testing in the Gordon Plaza area of the ASL neighborhood, in anticipation of the construction of the Gordon Plaza single-family homes. As a result of the soil testing, the City required the developers of Gordon Plaza to add topsoil before constructing the homes. In 1980, sixty-seven family homes comprising Gordon Plaza were built. The Gordon Plaza home buyers were not told that their homes were located on what had once been a part of the City's landfill.

In 1975, the Orleans Parish School Board (School Board) purchased a tract of land along Abundance Street in the ASL neighborhood, with the intent to build an elementary school. In 1984, the School Board began plans for construction of Moton Elementary School on the site. Because the School Board knew when it purchased the property that the site had once been a part of the City's landfill, the School Board hired engineering firms to conduct an environmental evaluation of the property. Environmental testing on the site identified the presence of numerous toxic and hazardous materials, including lead, arsenic, mercury, and polycyclic aromatic hydrocarbons. Because of the presence of the toxic and hazardous materials, the School Board hired several environmental consultants to advise them on how the site could be remediated to eliminate the danger of harmful exposures created by the presence of hazardous materials. The environmental consultants recommended that the entire site be excavated to a depth of three feet, with the top three feet of contaminated soil removed and replaced with two feet of clean topsoil. Between the clean topsoil and the hazardous materials, the consultants recommended that a layer of six inches to one foot of impermeable clay be placed over the entire site. In 1986-87, Moton Elementary School opened for kindergarten through sixth grade with an enrollment of approximately nine hundred

students. The School Board did not tell its employees or the parents of the students that the school had been built on a part of the City's former landfill or that environmental testing had identified the presence of toxic materials on the site. During the 1991–92 school-year, there were plumbing problems at Moton Elementary which required under-slab construction and repairs. This necessitated the construction of a trench and the breach of the three-foot layer of clean topsoil.

The Environmental Protection Agency (EPA) tested the soil in parts of the ASL neighborhood in 1986 to determine whether the ASL site was contaminated. The residents were not given the results of the EPA's 1986 soil tests nor were they told that their property was contaminated or given any special instructions to follow or precautions to take to protect themselves from exposures to the soil. Between 1985 and 1986, the Louisiana Department of Health and the Agency for Toxic Substance Disease Registry (ATSDR) conducted a public health screening of children in the ASL neighborhood to determine whether there was an increased incidence of elevated blood lead levels. The residents were never told that their children had been exposed to excess levels of lead, nor were they given any special instructions or precautions to follow to protect their children from exposures to the soil.

In 1993, the EPA came back to the ASL site and conducted more soil tests throughout the neighborhood. The tests indicated that the soil was contaminated with more than one hundred forty toxic and hazardous materials, more than forty of which are known to cause cancer in humans. The EPA told the ASL residents to take special precautions to protect themselves from any exposure to the soil. In 1994, the EPA placed a portion of the ASL neighborhood on the National Priorities List and later that same year it declared that the ASL site was sufficiently contaminated to be named a Superfund site. Later that same year, the School Board closed the Moton Elementary School campus and the ASL residents formed the Concerned Citizens of the Agriculture Street Landfill, Inc. to qualify for federal grant funding to pay for the services of an environmental technical advisor.

In the mid–1990s, the EPA proposed a remediation plan for the ASL site that would remove and replace the top two feet of soil, where possible, with a semi-permeable barrier between the clean topsoil and the contaminated soil. The soil under buildings and the streets would not be disturbed. The ASL residents opposed the EPA's plan as being inadequate to remediate the site. The ASL residents supported an alternative voluntary relocation/buy-out plan. The EPA rejected the requests of the ASL residents and from 2000–2001, the EPA financed a $20,000,000.00 remediation project. In the remediation process, approximately two feet of soil was removed from around houses and

buildings where possible. Due to underground utilities, water lines, etc., only one foot of soil was removed in some areas. After the EPA completed the remediation work, the ASL residents were given a certificate of completion confirming that their property had been partially remediated. The EPA also gave the ASL residents a list of permanent restrictions on the use of their property and advised the ASL residents that they were responsible for maintaining the integrity of the clean layer of topsoil and the felt-like material that comprises the semi-permeable barrier between the clean layer of topsoil and the ground below.

Not satisfied with the steps taken to correct the problems with the ASL neighborhood, a number of the residents proceeded with a class action lawsuit. The named defendants in the action include the City, HANO, the School Board, and HANO's insurers, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, U.S. Fire Insurance Company, Republic Insurance Company, and South American Insurance Company/Louisiana Insurance Guaranty Association. The plaintiff class has previously been defined as follows: 1) current and former residents who have lived on the site of the former landfill, as defined as the area bounded on the north by Higgins Blvd., on the east by Louisa Street, on the south by Florida Avenue and on the west by Almonaster Avenue and the Peoples Avenue Canal, for at least twelve months prior to February 1, 1994; 2) current and former business owners and their employees who have operated a business on the former landfill site, as described above, for at least twelve months prior to February 1, 1994; 3) current residents who are the owners of record of their homes, or who are buying their homes but have not yet completed their payments; and 4) former students and employees of Moton Elementary School who attended or worked at the school on the site of the former landfill for at least twelve months or one school year prior to February 1, 1994.

*Johnson v. Orleans Par. Sch. Bd.*, 2006-1223, pp. 1-6 (La.App. 4 Cir. 1/30/08),

975 So.2d 698, 703–05 ("*Johnson VI*").

On December 18, 2000, the trial court signed a protective order directing all named defendants to refrain from communicating with class members regarding the litigation without the knowledge and participation of class counsel. Class counsel learned that defendant, the City of New Orleans, was in violation of the protective order due to discussions the City had with a few class members about

potential resolution of their buyout/relocation requests. Therefore, on December 27, 2021, class counsel on behalf of the John Johnson Class filed an emergency motion for contempt seeking to enforce the protective order.

On January 3, 2022, the Residents filed an *ex parte* motion for leave to intervene and limited petition of intervention. In their limited petition of intervention, the Residents asserted that the purpose of the intervention was to "defend against plaintiffs' counsels' contempt motion and any other efforts to interfere with their ability to advocate for themselves before their government free from interference…." On January 24, 2022, the trial court granted the *ex parte* motion for leave to intervene. On February 4, 2022, the John Johnson Class withdrew its motion for contempt, and subsequently, on March 7, 2022, the Class filed exceptions of no right of action, no cause of action, and res judicata in response to the intervention petition.

The hearing on the Class' exceptions was held on May 24, 2022, and the trial court granted all three exceptions. The judgment granting the Class' exceptions was signed on June 22, 2022. The Residents timely filed this devolutive appeal.

### Preliminary Matter – Exception of Prescription

The John Johnson Class filed an exception of prescription with this Court. Because any finding of merit regarding this exception would result in the dismissal of the limited intervention, we address it first.

A party may raise an exception of prescription on appeal if the case has not yet been submitted for decision, and if there is proof in the record to determine its merits; if not, the court may remand the issue for determination. *See* La. C.C.P. art. 2163; *Walker v. AMID/Metro P'ship, LLC*, 2012-0285, p. 5 (La. App. 4 Cir 1/16/13), 109 So.3d 35, 39 (citing La. C.C.P. art. 2163; *Cameron v. Delta Plumbing*, 2007-0672, p. 5 (La. App. 4 Cir. 2/13/08), 976 So.2d 343, 346). An exception of prescription is designed to stop the prosecution of stale claims. *See Prevo v. State ex rel. Dep't of Pub. Safety & Corr. Div. of Prob. & Parole*, 2015-0823, p. 4 (La. 11/20/15), 187 So.3d 395, 398 (citing *Wells v. Zadeck*, 2011-1232, p. 7 (La. 3/30/12), 89 So.3d 1145, 1149). The party raising the exception bears the burden of proof, unless it is evident on the face of the proceedings that the claim has prescribed, at which point the burden shifts to the plaintiff to show that the matter has not prescribed. *Id.* (citing *Campo v. Correa*, 2001-2707, p. 7 (La. 6/21/02), 828 So.2d 502, 508; *Williams v. Sewerage & Water Bd. of New Orleans*, 611 So.2d 1383, 1386 (La.1993)).

Regarding the exception of prescription, both the Residents and John Johnson Class state that there is no need to remand this issue to the trial court. We agree. The record before this Court contains the information necessary to decide the merits of this exception.

In urging the exception of prescription, the John Johnson Class contends that the Residents' limited petition for intervention is prescribed on its face and should be dismissed by this Court with prejudice. The Class asserts that the five

Individuals have been members by definition of the John Johnson Class since the inception of this case,[1] and the Corporation has been in existence since 2016. Therefore, their intervention should have been filed no later than 2016, when the Corporation was formed due to these five Individuals' assertion that they were being ignored by class counsel. In the alternative, giving the Residents the benefit of the doubt, the Class asserts that the intervention should have been filed in 2018, when the five Individuals maintain they began to protest, march, and file civil suits against the City of New Orleans in federal court.

The Residents oppose the exception of prescription by asserting that the John Johnson Class misstates the provisions of La. C.C.P. art. 1041, which does not impose a ninety-day time limit on interventions, as interventions that do not retard the progress of the principal action are timely. Further, the Residents maintain that their intervention claims are their justiciable rights to engage in unfettered free speech and to receive redress from their government, and the Class' motion for contempt sought to infringe upon these rights.

Demands that are incidental to the principal demand "may be instituted against an adverse party, a co-party, or against a third person." La. C.C.P. art. 1031. Intervention is one type of incidental demand. *Id.* La. C.C.P. art. 1033 sets the delay for filing incidental actions, such as interventions, and provides that after the answer to the principal demand has been filed, an incidental demand may be filed with leave of court "if it will not retard the progress of the principal action."

---

[1] The original petition for damages was filed on August 31, 1993.

La. C.C.P. art. 1041, entitled "When prescribed incidental or third party demand is not barred", states:

> An incidental demand is not barred by prescription or peremption if it was not barred at the time the main demand was filed and is filed within ninety days of date of service of main demand or in the case of a third party defendant within ninety days from service of process of the third party demand.

"La. C.C.P. art. 1067[2] [now known as La. C.C.P. art. 1041] has been characterized by this Court as an exemption statute, which exempts any incidental demand from any applicable prescriptive statute whose prescriptive period would accrue during the ninety-day period from the date of service of the main demand or third-party demand." *Traylor v. Reliance Ins. Co.*, 1998-1379, pp.2-3 (La. App. 4 Cir. 7/1/98), 715 So.2d 1253, 1255 (citing *Kelly v. Louisiana Stadium and Exposition District,* 380 So.2d 669 (La.App. 4 Cir.1980)). As the statute and jurisprudence demonstrates, La. C.C.P. art. 1041 is not a prescription statute; rather, it is an exemption statute allowing otherwise prescribed incidental demands to avoid prescription. As such, the John Johnson Class' reliance on La. C.C.P. art. 1041 to assert prescription is misplaced.

"Prescription cannot run against a cause of action that has not accrued or while that cause of action cannot be exercised." *Reggio v. E.T.I.*, 2007-1433, pp.10-11 (La. 12/12/08), 15 So.3d 951, 957 (quoting *Bailey v. Khoury,* 2004–0620, p.9 (La.1/20/05), 891 So.2d 1268, 1275). "Thus, if the action had not or could not have prescribed because the cause of action had not yet accrued, the time

---

[2] La. C.C.P. art. 1041 was redesignated from La. C.C.P. art. 1067 by Acts 2017, No. 419, §5. *See* Credits, La. C.C.P. art. 1041.

limitations of article 1067 would not apply." *Reggio*, 2007-1433, p.10, 15 So.3d at 957. The John Johnson Class filed the motion for contempt on December 27, 2021, and on January 3, 2022, the Residents filed their motion for leave and limited petition for intervention. Throughout their limited petition for intervention, the Residents state that the purpose of the intervention is to oppose the contempt motion. As pled in the petition, the filing of the motion for contempt necessitated the Residents' need to intervene. Consequently, the Residents could not have asserted the claims pled in their petition prior to the filing of the contempt motion. Therefore, we find that the Residents' limited petition for intervention is not prescribed.

### Exception of No Right of Action

In *Roy Anderson Corp.*, this Court set forth the applicable standard of review for an exception of no right of action as follows:

> "The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit." *Two Canal Street Investors, Inc. v. New Orleans Building Corp.*, 2016-1306, p. 8 (La. App. 4 Cir. 2/15/17), 212 So.3d 611, 617 (citation omitted). As set forth in *Louisiana Citizens Prop. Ins. Corp. v. LAA Shoring, LLC*, 2016-1136, p. 5 (La. App. 4 Cir. 6/14/17), 223 So.3d 17, 23:

> "The determination of whether a plaintiff has a right of action is a question of law." *Mendonca v. Tidewater Inc.*, [20]03-1015, p. 3 (La. App. 4 Cir. 12/17/03), 862 So.2d 505, 508. "The standard of review of a trial court's ruling on an exception of no right of action is *de novo*." *N. Clark, L.L.C. v. Chisesi*, [20]16-0599, p. 3 (La. App. 4 Cir. 12/7/16), 206 So.3d 1013, 1015. "Therefore, this court is required to determine whether the trial court applied the law appropriately." *Mendonca*, [20]03-1015, p. 3, 862 So.2d at 508.

*Roy Anderson Corp. v. 225 Baronne Complex, L.L.C.*, 2017-1005, pp. 4-5 (La. App. 4 Cir. 7/11/18), 251 So.3d 493, 498.

In most cases, "an action can be brought only by a person having a real and actual interest which he asserts." La. C.C.P. art. 681. "The function of the peremptory exception is to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception tends to dismiss or defeat the action." La. C.C.P. art. 923. A no right of action or no interest in the plaintiff to institute a suit is an objection that may be raised through a peremptory exception. La. C.C.P. art. 927A(6).

"When the facts alleged in the petition provide a remedy under the law to someone, but the plaintiff who seeks the relief for himself or herself is not the person in whose favor the law extends the remedy, the proper objection is no right of action, or want of interest in the plaintiff to institute the suit." *Gunasekara v. City of New Orleans*, 2018-0639, p. 6 (La. App. 4 Cir. 1/30/19), 264 So.3d 1236, 1240 (citing *N. Clark, L.L.C.*, 2016-0599, pp. 5-6, 206 So.3d at 1016-17). "The burden of proof of establishing the exception of no right of action is on the defendant-exceptor." *Id.*, 2018-0639, p.7, 264 So.3d at 1241. "The exception of no right of action does not raise the question of the plaintiff's ability to prevail on the merits or the question of whether the defendant may have a valid defense." *Id.*

"On consideration of an exception of no right of action the averments of fact in the pleading must be taken as true in the absence of evidence to the contrary." *Id.* However, when the grounds do not appear from the petition,

evidence may be introduced to support or controvert the objections pleaded. La. C.C.P. art. 931. "In examining an exception of no right of action, a court should focus on whether the particular plaintiff has a right to bring the suit while assuming that the petition states a valid cause of action for some person." *Gunasekara*, 2018-0639, p. 7, 264 So.3d at 1241.

### Discussion

On appeal, the Residents assert that the trial court erred in sustaining the John Johnson Class' exceptions of no right of action, no cause of action, and res judicata. The Residents assert two main points: (1) they meet all the legal requirements for intervention; and (2) the John Johnson Class' exceptions have no merit.

Louisiana Code of Civil Procedure Article 1091 provides:

> A third person having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties thereto by:
> (1) Joining with plaintiff in demanding the same or similar relief against the defendant;
> (2) Uniting with defendant in resisting the plaintiff's demand; or
> (3) Opposing both plaintiff and defendant.

Louisiana courts have interpreted La. C.C.P. art. 1091 to allow intervention where a justiciable right exists and that right has a connexity with the facts, circumstances, and objects of the main demand. *Harrison v. Gaylord's Nat'l Corp.*, 539 So.2d 909, 910 (La. App. 4th Cir. 1989). A "justiciable right" for purposes of La. C.C.P. art. 1091 "means the right of a party to seek redress or a remedy against either plaintiff or defendant in the original action or both, and where those parties have a real interest in opposing it." *Amoco Prod. Co. v. Columbia Gas*

*Transmission Corp.,* 455 So.2d 1260, 1264 (La. App. 4th Cir. 1984). Connexity exists if the intervenor's claim is "so related or connected to the facts or object of the principal action that a judgment on the principal action will have a direct impact on the intervenor's rights. *Id.*

In this case, the Residents are seeking to intervene in order to "resist the demands of the Contempt Motion, which seek to illegally and improperly prevent the City Council from engaging in budget planning that could significantly benefit intervenors." Since 2016, the Residents have advocated for the government – mainly the City of New Orleans – to relocate residents off the toxic landfill, and their advocacy has included community meetings, protests, and other acts of activism. Undoubtedly, the Residents have a right to protect their First Amendment rights and advocate for a government-funded relocation. However, the question is whether this right has connexity to the claims asserted in this class action litigation.

Diminution of property value and emotional distress are the only two types of claims that form a basis for recovery in this case. Relocation is not a recoverable claim in this litigation. Rather, relocation is an extra-judicial remedy that must be pursued outside of this litigation. The Residents state in their intervention petition that the City's proposed budget designation for relocation "does not impact or relate to this litigation", and "[s]uch a budget item does not constitute an appropriation of funds to pay the judgments in this litigation." Further, the petition states that "[t]he proposed City budget item funds to relocate residents and redevelop the Gordon Plaza site are not in the nature of damages." Based on the

intervention petition, it is evident that judgment on the main action (i.e. diminution of property value and emotional distress) will have no impact on the Residents' pursuit of a government-funded relocation. As the Residents' intervention claims are not so related to the main action that "a judgment on the main action will have a direct impact on the intervenor's rights", the requisite element of connexity does not exist. Therefore, the Residents do not have a right to intervene in this litigation, and the trial court did not err in granting the John Johnson Class' exception of no right of action.

On appeal, the Residents also assert that the trial court erred in granting the Class' exceptions of no cause of action and res judicata. While we note these exceptions, we do not need to decide whether the trial court's judgment was correct as we have already affirmed the trial court's determination that the Residents do not have a right of intervention in this litigation.

## **Decree**

For the forgoing reasons, the exception of prescription is denied, and the trial court's June 22, 2022 judgment granting the exception of no right of action in favor of the John Johnson Class is affirmed.

**AFFIRMED**